1
2
3

## UNITED STATES DISTRICT COURT

4

## FOR THE EASTERN DISTRICT OF CALIFORNIA

5

6    JOSE A. ORTIZ                                    CASE NO.  1:12-CV-01033-LJO-GSA

7            Plaintiff,                               MEMORANDUM DEICISION AND
                                                      ORDER GRANTING IN PART AND
8        v.                                           DENYING IN PART DEFENDANT'S
                                                      MOTION FOR SUMMARY
9    GEORGIA PACIFIC                                  JUDGMENT (DOC. 41)

            Defendant.
10

11                              I. __INTRODUCTION__

12        Plaintiff Jose A. Ortiz brings this employment discrimination case against Defendant Georgia

13   Pacific ("GP"), alleging, among other things, that he was subjected to sexual harassment at the hands of

14   a female co-worker, that GP failed to take action to address the co-worker's behavior, and that GP

15   retaliated against him after he complained of the harassment.

16        The First Amended Complaint ("FAC") asserts ten causes of action. The first through sixth

17   allege unlawful gender based discrimination, hostile work environment, and retaliation, in violation of

18   Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), and California's Fair

19   Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940. Doc. 26 at ¶¶ 21-82. The FAC also

20   alleges GP aided and abetted the co-worker's sexual harassment in violation of Cal. Gov. Code. §

21   12940(i), *id*. at ¶¶ 83-88; and failed to prevent the unlawful discrimination and harassment in violation

22   of Cal. Gov. Code § 12940(k), *id*. at ¶¶ 89-98. Finally, Plaintiff asserts claims for intentional and

23   negligent infliction of emotional distress. *Id*. at ¶¶ 99-111.

24        Before the Court for decision is GP's motion for summary judgment or in the alternative

25   summary adjudication as to all of the claims in the case as well as to Plaintiff's prayer for punitive

26   damages. Doc. 41. Defendant filed a statement of undisputed fact ("DSUF"), Doc. 41-2, along with

1

1  supporting documents. Plaintiff filed an opposition, Doc. 43, and a response to Defendant's statement of

2  fact, as well as a separate statement of disputed fact, Doc. 44. Defendant replied, Doc. 47, and filed

3  responses to Plaintiff's statements of fact, Doc. 48, as well as evidentiary objections, Doc. 50.[1] This

4  motion was originally set for hearing on September 16, 2013, but the hearing was vacated and the matter

5  submitted for decision on the papers pursuant to Local Rule 230(g). Doc. 52.

6  ## II. FACTUAL BACKGROUND[2]

7  Plaintiff was hired by GP on October 3, 2002 to serve as a general laborer in GP's Modesto

8  corrugated packaging manufacturing facility. Cormier Decl., Doc. 41-3, at ¶¶ 5, 16; DSUF #2. Plaintiff

9  holds the position "Flexo Assistant Machine Operator." DSUF #2. He has been on medical leave since

10 December 2011. *Id.* GP's written employment policies prohibit discrimination, unlawful harassment,

11 and/or retaliation. DSUF #8.

12 Plaintiff claims that, beginning in June 2010, Maria Salamanca, a female employee in Plaintiff's

13 department, began sexually harassing Plaintiff. Both employees worked together on some occasions in

14 2010 and 2011. Ortiz. Depo. at 46:9-19.[3]

15 On or about November 29, 2010, Plaintiff reported Ms. Salamanca's conduct for the first time to

16 GP's harassment hotline. According to notes of that conversation maintained by GP, Plaintiff reported

17 that since June 2010, Ms. Salamanca had been "brushing up against [Plaintiff] when she was working

18 near his machine [station]" and "had also been staring at him when [Plaintiff] was leaving at the end of

---

20 [1] It is not this Court's practice to rule on evidentiary matters individually in the context of summary judgment, unless
21 otherwise noted. Objections that are material and meritorious have been sustained. *See Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n. 1 (C.D. Cal. 2010) (noting that it is often unnecessary and impractical for a court to methodically scrutinize and give a full analysis of each evidentiary objection on a motion for summary judgment); *Burch v.*
22 *Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118–22 (E.D. Cal. 2006) (same).
[2] The Court admonishes the parties for their sloppy and often entirely inadequate citation to record evidence in the pleadings.
23 Both parties' memoranda frequently cite directly to exhibits and depositions only, without making reference to their statements of fact. This makes it exceedingly difficult for the Court to cross-reference factual material against the statements
24 of fact and responses in order to determine whether disputes exist. In many instances, Defendant's citations to their own statement of fact are inaccurate, and Defendant's reply is almost entirely lacking in citations to the record. This shows direct disrespect for the Court's time constraints and will not again be tolerated in subsequent dealings in this Court.
25 [3] Plaintiff also presents the declaration of Mark Craytor, who states that Plaintiff and Ms. Salamanca worked together "at times" during 2010 and 2011. Defendant objects to this evidence on the ground that Craytor lacks personal knowledge of
26 these facts. The Court declines to rule on this objection. Craytor's evidence is totally superfluous for purposes of summary judgment, as Plaintiff himself has testified that he worked with Ms. Salamanca on the same machine for an entire shift "many times." Ortiz Depo. at 46:21-24.

2

the day." Cormier Decl. ¶ 24; Plaintiff's Exhibit ("PX") 6 (GP 498). Later that same day, Plaintiff called the hotline again to report that Ms. Salamanca "shows her breasts at the picnic table," "says a lot of sexually explicit things at the picnic table," and "hugs her co-workers all the time and gives them shoulder massages." *Id*. Plaintiff also reported that when he leaves work, Ms. Salamanca "watches by the window so she can intercept him and try to touch him." *Id*.

Plaintiff called the company hotline another eleven times from November 29, 2010 through March 14, 2011 in order to complain about Ms. Salamanca's conduct or to check in on the status of his prior complaints. PX 6, Doc. 46 (GP 498-99).

On or about December 7, 2010, Patrick Macias, Plaintiff's son-in-law, also reported to GP's hotline that Ms. Salamanca was engaging in inappropriate behavior of a sexual nature. Cormier Decl. ¶ 25. In his declaration, Mr. Macias indicates: he "heard [his] co-workers speak about Maria Salamanca in an explicit, sexual manner;" he "observed Tim Juarez and Maria Salamanca touch each other in a sexual manner;" and he "observed that Maria Salamanca and other co-workers [] would engage in highly sexualized conversations during business hours." PX 3.

GP opened an investigation into the allegations. Among other things, GP managers interviewed Ms. Salamanca and Plaintiff on February 14, 2011.[4] HR Manager Marites ("Tess") Cormier interviewed Plaintiff. Cormier Decl. ¶ 26. According to Ms. Cormier's interview notes, with respect to Plaintiff's allegation that Ms. Salamanca was "brushing up against him," Plaintiff denied that Ms. Salamanca actually made physical contact with him. *Id*. at ¶ 26a. He also denied that Ms. Salamanca actually "showed her breasts" in the workplace; rather, Plaintiff explained that she wore low cut tops to work. *Id*. at ¶ 26b. Regarding sexually explicit language, Plaintiff asserted that Ms. Salamanca used the "F" word, and explained his belief that, while it is acceptable for men to use such language, women should not. *Id*. at ¶ 26bc. Finally, regarding the incidents in which Plaintiff complained that Ms. Salamanca tried to

---

[4] Although Plaintiff initially complained of this harassment on November 29, 2011, Plaintiff and Ms. Salamanca were not interviewed about the matter until February 14, 2011. PX 6 (GP 501-506). GP points out that Ms. Salamanca was on leave from the time of Plaintiff's complaint until shortly before her interview in February. Suppl. Cormier Decl., Doc. 49, ¶ 7. GP delayed completion of their investigation until her return. PX 6 (GP 501-506).

intercept him to touch him, Plaintiff explained that on a few occasions, Ms. Salamanca would come to the door where the time clock was located and stand close to him while he was trying to punch out for the day. *Id.* at ¶ 26d.

At his January 23, 2013 deposition, Plaintiff testified that, among other things, Ms. Salamanca would rub her chest against his chest and bend over in front of him, placing her buttocks on Plaintiff's pelvic area. *Id.* at 51:4-7. According to Plaintiff, this would occur every time Ms. Salamanca was near Plaintiff. *Id.* 45:20-21. However, it is undisputed that Plaintiff did not explain the extent of these purported physical contacts to GP, at least not during GP's initial investigation. Plaintiff testified at his deposition that he communicated to Ms. Cormier at the February 14, 2011 interview that he was "physically touched" by Ms. Salamanca, but admits that he refused to describe or show anyone how the touching occurred, apparently because Mr. Ortiz did not want to touch Ms. Cormier in demonstration. Ortiz Depo. 116-117. Plaintiff also denies ever expressing a belief that women should not use "inappropriate" language. Ortiz Depo. 159-60.[5]

Based on GP's investigation, GP concluded that Plaintiff's November 29, 2010 sexual harassment allegations were unsubstantiated, and the matter was closed on March 16, 2011. Cormier Decl. ¶ 28 & Defendant's Exhibit ("DX") I.

On or about May 11, 2011, Plaintiff again reported his ongoing problem with Ms. Salamanca to Robert Einhell, his shift supervisor. Cormier Decl. ¶ 30; DX J. Plaintiff reported that while he was trying to enter the facility to punch in, Ms. Salamanca was inside the facility looking out the door window at him. *Id.* Ms. Salamanca allegedly opened the door and looked at him while he entered the facility, and then proceeded to laugh at him. *Id.* According to GP's records, Plaintiff denied that any physical contact was made. *Id.* Plaintiff's deposition testimony does not contradict GP's records. Although he testified that Ms. Salamanca did touch him, he could not recall whether he told Mr. Einhell as much. Ortiz Depo. at 163-64.

---

[5] Plaintiff testified at his deposition that he did tell Ms. Cormier and Todd Wells, Plaintiff's direct supervisor, that Ms. Salamanca would "bend[] over in front of [Plaintiff] and rub[] her buttocks against [his] genitals," but he could not recall when he relayed this accusation to them. *See* Ortiz Depo. at 54: 6-16.

GP again investigated the complaint. Ms. Cormier and Todd Wells interviewed Ms. Salamanca approximately thirty (30) minutes after the alleged incident took place. Cormier Decl. ¶ 32 & DX K. Ms. Salamanca admitted to opening the door but denied laughing at Plaintiff. *Id*. Ms. Salamanca further explained that if she had known Plaintiff would be coming in early, she would have avoided being near the badge reader. *Id*.

On May 12, 2011, Ms. Cormier and Mr. Wells interviewed Plaintiff about the incident. Cormier Decl. ¶ 33; DX K. Plaintiff explained that he did not need Ms. Salamanca to open the door for him and that he believed Ms. Salamanca was trying to indicate that he was a "dumb ass" by laughing at him. *Id*.

GP scheduled a meeting on May 12, 2011 to counsel both parties. Plaintiff, Ms. Salamanca, and a union representative attended. Cormier Decl. ¶¶ 34-35; DX K. At this meeting, both parties were instructed to respect each other and ignore each other whenever they were in close proximity. *Id*. According to Ms. Cormier's notes, both parties consented to abide by these instructions. *Id*.

On June 14, 2011, Plaintiff filed a charge of sex discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging, in pertinent part:

> In June 2010, Maria Salamanca, coworker, began sexually harassing me. For example, she would purposefully rub her body against mine and would engage in inappropriate conduct with other coworkers. I reported the harassment to Tess Cormier, HR assistant, in November 2010, after which an investigation was launched. In February 2011, I was informed by Bill Yeager, HR Director, that the investigation failed to disclose any evidence of harassment and merely gave Ms. Salamanca a verbal warning; however, despite a second complaint, Ms. Salamanca continues to engage in harassing behavior such as obstructing my way. Moreover, after reporting the harassment, I was subjected to discipline by receiving negative points for failing to work overtime while others, with less seniority, refuse overtime and do not receive points against them.

PX 7, Doc. 46 at p 97 of 150.

On August 25, 2011, Plaintiff was cited for a safety violation involving the company's Logout/Tagout ("LOTO") rule. Cormier Decl. ¶ 11, 21, 53; DX F at p. 27. The LOTO rule requires that machines be locked out before employees enter restricted areas, or when employees are setting up or cleaning the machines. GP investigated the violation, including interviewing witnesses, and concluded the violation warranted a three day unpaid suspension (the least onerous of the mandatory disciplinary

actions required under GP policy). *Id.* On September 6, 2011, Plaintiff was issued a written performance review for a three day unpaid suspension. Cormier Decl. ¶ 21; DX H.

On November 22, 2011, Plaintiff filed a second charge with the EEOC, alleging he was subjected to unfair discipline and harassment after filing his previous EEOC complaint. PX 7, Doc. 46 at 98 of 150. This complaint alleged, in pertinent part:

> Subsequent to having filed [my previous] charge, I was subjected to unfair discipline and harassment. For example, on or about 8/25/2011, Dan Brasher, Safety Manager, suspended me for violating a safety rule; however, I am aware of other employees who have committed similar violations and were not disciplined.
>                                        ***

*Id.*[6]

GP investigated the retaliation allegations in both of Plaintiff's EEOC charges and found them to be without merit. Cormier Decl. ¶ 43. Regarding Plaintiff's allegation that he was disciplined for the LOTO violation while another employee was not, Ms. Cormier's investigation revealed that negative points were issued to employees thirteen times and suspensions were issued five times for LOTO violations in the Modesto facility. *Id.* ¶ 48. Ms. Cormier also concluded that the examples Plaintiff provided of others who were not disciplined were factually distinguishable from Plaintiff's LOTO violation. *Id.* ¶ 50.

On June 26, 2012, Plaintiff filed the instant lawsuit. His initial complaint reiterated the allegations contained in his EEOC claims. Doc. 1. His first amended complaint, filed December 14, 2012, further detailed that Ms. Salamanca's sexually harassing behavior consisted of, among other things, "unwelcome sexual touching, stalking at work, and explicit sexual commentary." Doc. 26 at ¶ 14.

### III. <u>STANDARD OF DECISION</u>

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party

---

[6] Plaintiff made other complaints of retaliatory conduct in his second EEOC complaint, but these have not been raised on summary judgment.

6

bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation and quotation omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence to support the non-moving party's case." *Id*. When the moving party meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material facts by either:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984.

7

# IV. DISCUSSION

**A.     The "Omitted Evidence."**

Defendant argues that Plaintiff made admissions against his self-interest by denying during GP's initial investigation into his complaints that Ms. Salamanca touched him or engaged in any overtly sexual acts. Doc. 47 at 2. Defendant argues that Plaintiff's subsequent attempts to use contradictory evidence to prevent summary judgment should be disregarded as sham evidence under the doctrine of "pre-trial estoppel." *Id.*

In support of the application of this legal doctrine, Defendant cites a California case, *D'Amico v. Board of Medical Examiners*, 11 Cal. 3d 1, 21-22 (1974),[7] and a district court case from the Southern District of Ohio, *Nilavar v. Mercy Health System-Western Ohio*, 254 F. Supp. 2d 897, 901-902 (S.D. Ohio 2003), Doc. 47 at 2, totally ignoring the body of caselaw on this subject from within this Circuit, including a recent ruling from this Court, *Oyarzo v. Tuolumne Fire Dist.*, 2013 WL 3327882, --- F. Supp. 2d --- (E.D. Cal. July 1, 2013). The relevant rules are described in *Oyarzo*:

> A party cannot "create a triable issue of fact, and thus survive summary judgment, merely by contradicting his or her own sworn deposition testimony with a later declaration." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998). This is because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). The sham affidavit rule may be invoked only if a district court makes "a factual determination that the contradiction was actually a sham" and "the inconsistency between a party's deposition testimony and subsequent affidavit … [is] clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009).

*Id*. at * 12.

These cases stand for the proposition that a party cannot directly contradict a statement made in a sworn deposition by a later declaration. None of these cases stand for the proposition that a party cannot contradict an unsworn statement to a human resources manager during an internal investigation by

---

[7] Any holding from this state law case concerning procedures to be applied to the summary judgment process is inapplicable here. Under the *Erie* doctrine, federal law governs the procedural aspects of summary judgment in a diversity case, *Caesar Electronics Inc. v. Andrews*, 905 F.2d 287, 289 n.3 (9th Cir. 1990), a doctrine that has been extended to cases in which a federal court exercises supplemental jurisdiction over a state law claims, *see In re Exxon Valdez*, 484 F.3d 1098, 1100 (9th Cir. 2007).

subsequent deposition testimony. Defendant's request that the Court disregard Plaintiff's "sham issues of fact" is DENIED.

**B.    Employment Discrimination Claims.**

**1.    Sex Discrimination Claims.**

Both Title VII and FEHA prohibit employment discrimination based upon sex. Title VII makes it unlawful for employers:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1), (2). Because the purposes of Title VII and FEHA are similar, the standard for proving intentional discrimination under Title VII applies to FEHA discrimination claims. *Los Angeles Cnty. Dep't of Parks & Recreation v. Civil Serv. Com*., 8 Cal. App. 4th 273, 280 (1992).

The three-stage burden shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies to both Title VII and FEHA discrimination claims. *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 847-50 (9th Cir. 2004), *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). Pursuant to this framework, Plaintiff must first establish a prima facie case. *See Fonseca,* 374 F.3d at 847-49. If Plaintiff succeeds, the burden shifts to Defendant to establish a legitimate reason for the adverse employment action. *Id*. at 849-50. If Defendant carries its burden, Plaintiff must demonstrate that the stated reasons are merely pretext for discrimination. *Id*.

**a.    Prima Facie Case of Discrimination.**

Plaintiff may establish a prima facie case by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."

9

*Fonseca*, 374 F.3d at 847.

For purposes of this motion, the first two elements are undisputed. First, Plaintiff is a member of a protected class. It is well established that both sexes are protected from discrimination under Title VII. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination 'because of … sex' protects men as well as women."). Second, nothing in the record suggests Plaintiff was unqualified for the position he held.

### (1)    Adverse Action.

Plaintiff was suspended for three days without pay on or about September 6, 2011, purportedly for a LOTO safety violation that occurred on or about August 25, 2011. DSUF # 24. Defendant's contention that the suspension does not qualify as an adverse action, Doc. 47 at 4, is without merit. The Ninth Circuit has recognized that "an adverse employment action exists where an employer's action negatively affects its employee's compensation." *Fonseca*, 374 F.3d at 847. A suspension without pay constitutes an adverse employment action. *Id*. at 848 (suspension later reduced to a warning letter was nevertheless adverse action for purposes of Title VII); *see also Kelley v. Cnty. of Ventura Pers. Dep't*, 28 F.3d 106, *1 (9th Cir. 1994) (table) (noting that defendant did not dispute that three day suspension constituted adverse employment action).

### (2)    Similarly Situated.

Plaintiff argues that he has presented evidence that could permit a reasonable finder of fact to conclude that similarly situated individuals outside his protected class were treated more favorably than he was treated. First Plaintiff points out that it is undisputed that Ms. Salamanca made her own report of sexual harassment against a male co-worker. In response, GP gave that male co-worker a verbal warning, while Ms. Salamanca received no discipline as a result of Mr. Ortiz's complaints. This example entirely misses the point of similarly situated employee evidence. Such evidence is a means of demonstrating a causal connection between the adverse action and Plaintiff's protected status. The comparator individual must be similarly situated to the individual seeking relief "in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d

10

634, 641 (9th Cir. 2003) ("[I]individuals are similarly situated when they have similar jobs and display similar conduct.").

Here, the adverse action complained of is discipline in connection with a safety violation. Plaintiff must demonstrate that <u>in being disciplined</u> he was treated differently from other employees outside his protected class. *See Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 537 (9th Cir. 1982) (explaining that a disparate treatment case requires proof that plaintiff was "singled out and treated less favorably than others similarly situated"). To connect this adverse action to Plaintiff's protected status as a male, he must present an example of a similarly situated female who was treated differently in connection with discipline for a safety violation. *See Garcia v. Salt River Project Agr. Imp. & Power Dist.*, 618 F. Supp. 2d 1092, 1098 (D. Ariz. 2007) (refusing to find plaintiff similarly situated to co-worker who did not have a similar history of preventable accidents). Because there is no evidence that Ms. Salamanca engaged in conduct that could even arguably have led to discipline for safety violations, her situation is not analogous for purposes of supporting a Title VII discrimination claim where the asserted adverse action is discipline for a safety violation.

### b.   Other Circumstances/Inference of Discrimination.

In the absence of evidence that a similarly situated individual was treated differently, Plaintiff may point to evidence of other circumstances surrounding the adverse employment action that give rise to an inference of discrimination. Plaintiff attempts to satisfy this alternative standard in two ways. First, Plaintiff maintains that other individuals did not suffer any discipline after committing the same LOTO safety violation for which he received discipline. Plaintiff claims to have observed at least one other person commit a LOTO violation. Ortiz Depo. 136:9-19; 138:3-7 (observing the conduct). Plaintiff complained to management about his belief that this individual was not disciplined. PX 6, Doc. 46 at GP 489, 490, 493 (documentation re: Ortiz's complaint that others were not disciplined). It appears to be undisputed that this other individual was not disciplined. *Id.* at GP 493. Even assuming that Plaintiff's

disciplinary violation was similar to the other individual's violation,[8] there is no evidence to support an inference that GP drew any distinction between these two violations because of Plaintiff's sex. There is no evidence, for example, that the other violator was a woman. Whether this evidence supports Plaintiff's claim for retaliation is addressed separately below.

Plaintiff next points to a series of comments made by his superiors about his sexual harassment complaints. According to Plaintiff's version of events, upon hearing of Plaintiff's complaint of sexual harassment, GP Plant Manager "Troy,"[9] allegedly told Plaintiff that if Plaintiff continued to "feel[] like that," Plaintiff "would never get to where he [Troy] was at…." Ortiz Depo. 42:1-3. Troy then asked Plaintiff to "throw [his complaint] in the trash." *Id.* at 42:3-4. Plaintiff also maintains that Todd Wells joked that the conduct Plaintiff complained of "couldn't be sexual harassment." *Id.* at 88: 3-4.[10]

Viewing this evidence in a light most favorable to Plaintiff, a finder of fact could conclude that GP managers discriminated against Plaintiff because he was a male making a complaint of sexual harassment against a female co-worker. Plaintiff has established a prima facie case of sex discrimination.

### c.   <u>Legitimate Non-Discriminatory Reason /Pretext.</u>

"If the plaintiff establishes a prima facie case, the burden of production-but not persuasion-then

---

[8] Defendant maintains that while Plaintiff had more than ten years of experience at the time of his LOTO violation, this other individual was not properly trained at the time the other violation occurred, making discipline inappropriate. *See* Doc 47 at 3; PX 6 at GP 493.

[9] The Court has been unable to identify Troy's full name from the present record. Accordingly, he will be referenced simply as "Troy" herein.

[10] Defendant objects to the portions of Plaintiff's deposition in which Plaintiff describes these and other statements GP managers made to Plaintiff. Defendant objects that Plaintiff's testimony about these statements is inadmissible hearsay because "Plaintiff's testimony about what he said to GP managers, and the managers' statement[s] in response, are out of court statements offered to prove the truth of the matter[s] asserted." Doc. 48 at 8. This is incorrect. Plaintiff offers these statements not to prove their truth (e.g., that what Plaintiff alleged actually could not be sexual harassment). Rather, he offers these statements to prove that these statements were made and to demonstrate that GP's claimed rationale for disciplining him was a pretext for discrimination. This testimony is not barred by the hearsay rule. *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) (reversing as abuse of discretion district court's exclusion as hearsay of manager's threat to plaintiff that plaintiff would not get promotion if she held out for too much money in negotiations because statement was not offered to prove discriminatory intent, not to prove that plaintiff actually would not get the promotion); *Calmat Co. v. United States Dept. of Labor,* 364 F.3d 1117, 1124 (9th Cir. 2004) (testimony about racial slurs said to the witness is not hearsay because it is offered as evidence that racially-offensive speech occurred at the workplace). Moreover, even if these statements were hearsay, they would nevertheless be admissible under Federal Rule of Evidence 801(d)(2)(D), because they are offered against a party, GP, and were made by GP's employee within the scope of the employee-employer relationship.

12

shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Villiarimo*, 281 F.3d at 1062 (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer does so, the plaintiff must show that the articulated reason is pretextual, either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Id*. (internal citations and quotations omitted). To show pretext, a plaintiff can produce "either direct evidence, such as clearly sexist, racist, or similarly discriminatory statements or actions by the employer, or circumstantial evidence supporting an inference of retaliatory or discriminatory motive, so long as such evidence is specific and substantial." *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010);

Here, GP does articulate a legitimate, nondiscriminatory reason for suspending Plaintiff, namely that he committed a LOTO safety violation. DSUF #24. Plaintiff does not dispute that the violation occurred.[11]

Plaintiff argues GP's articulated reason for the suspension is unworthy of credence because at least one other employee committed a similar safety violation but was not disciplined. As explained above, Plaintiff claims to have observed at least one other person commit a LOTO without suffering discipline. Ortiz Depo. 136:9-19; 138:3-7 (observing the conduct); PX 6, Doc. 46 (GP 489, 490, 493) (documentation re: Ortiz's complaint that others were not disciplined). But, Defendant has presented evidence that this other individual was not properly trained and therefore that it would not have been proper to issue a LOTO violation to that individual. Cormier Decl. Ex. L (GP 493).[12] Plaintiff fails to present any evidence to the contrary; his only evidence is that he observed this individual commit the LOTO violation. As a result, he has failed to raise a dispute as to whether his suspension is unworthy of

---

[11] Plaintiff does argue that Todd Wells instructed him to commit the LOTO violation. *See* Pltf's Response to DSUF #24. While this assertion may be relevant to the pretext analysis, GP has articulated a legitimate, non-discriminatory reason for the suspension.

[12] This evidence comes in the form of Ms. Cormier's notes reflecting information provided to her by others. Even if, *arguendo*, this evidence is hearsay, Plaintiff failed to raise any such objection. For purposes of summary judgment, a court must consider evidence, even if it is hearsay, where the opposing party failed to object. *Skillsky v. Lucky Stores, Inc*., 893 F.2d 1088, 1094 (9th Cir. 1990); *see also Orlando v. Hotel Employees & Rest. Employees Int'l Union Welfare Fund*, 46 F.3d 1143 (9th Cir. 1995) (hearsay objection may be waived).

1   credence.

2        Plaintiff also testified at his deposition that GP managers made various statements indicating

3   discriminatory intent. As described above, according to Plaintiff, upon hearing of Plaintiff's complaint

4   of sexual harassment, GP Plant Manager Troy, told Plaintiff that if Plaintiff continued to "feel[] like

5   that," Plaintiff "would never get to where he [Troy] was at…." Ortiz Depo. 42:1-3. Troy then asked

6   Plaintiff to "throw [his complaint] in the trash." *Id.* at 42:3-4. Plaintiff also maintains that Todd Wells

7   joked that the conduct Plaintiff complained of "couldn't be sexual harassment." *Id.* at 88: 3-4.

8        The next step in the analysis requires the Court to determine whether these comments constitute

9   "direct evidence" of discriminatory animus. "Direct evidence is evidence which, if believed, proves the

10  fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc*., 150

11  F.3d 1217, 1221 (9th Cir. 1998); *see also Berg v. California Horse Racing Bd*., 419 F. Supp. 2d 1219,

12  1229 (E.D. Cal. 2006) ("[A] statement constitutes circumstantial evidence [if] it requires an additional

13  inferential step to demonstrate that the [employer acted] because of [p]laintiff's gender."). On the one

14  hand statements containing sexist slurs would clearly constitute direct evidence. *See Chuang v. Univ. of

15  Cal. Davis,* 225 F.3d 1115, 1128 (9th Cir. 2000) (holding that the statement "two chinks ... were more

16  than enough" is direct evidence of discrimination); *Cordova v. State Farm Ins. Cos.,* 124 F.3d 1145,

17  1148 (9th Cir. 1997) (holding that the statement "dumb Mexican" is direct evidence of discrimination);

18  *Coghlan*, 413 F.3d at 1095 ("Direct evidence typically consists of clearly sexist, racist, or similarly

19  discriminatory statements or actions by the employer."); *Godwin*, 150 F.3d at 1221 (plaintiff presented

20  direct evidence of discriminatory intent because her supervisor said he "did not want to deal with [a]

21  female"). On the other hand, purely generic statement unrelated to protected status must be judged under

22  the "specific and substantial" circumstantial evidence test. *See Aguilera v. Golden Eagle Distributors,

23  Inc.*, 2007 WL 2904167, *2 (D. Ariz. Oct. 4, 2007) (decisionmaker's statement to plaintiff that "I think

24  it's time for you to start looking for another job" was "not the kind of remark that qualifies as direct

25  evidence of discrimination"); *Berg*, 419 F. Supp. at 1229 (rejecting plaintiff's argument that a statement

26  was direct evidence of discrimination and treating that statement as circumstantial evidence subject to

the "specific and substantial" requirement).

Here, the offered statements make no mention of Plaintiff's protected status as a male, nor do they contain any sexist comments, or otherwise connect GP's conduct to Plaintiff's protected status. Therefore, the statements must be "specific and substantial" to warrant a finding of pretext. In other words, the statements must "specifically or substantially demonstrate that Defendants' proffered reason for the alleged adverse employment action is a pretext for gender discrimination." *Berg*, 419 F. Supp. 2d at 1230. Even viewing these statements in a light most favorable to Plaintiff, they do not satisfy this standard. Even assuming Troy criticized Plaintiff for making an allegation of sexual harassment and suggested such allegations would hinder Plaintiff's career advancement, there is no indication in these statements or otherwise that Troy offered such commentary because Plaintiff was a <u>male</u> making a complaint of sexual harassment. The same logic applies to Todd Well's comment. Wells' comments do not suggest Wells discounted Plaintiff's sexual harassment allegations because Plaintiff was male. Rather, the undisputed evidence demonstrates that Plaintiff in fact declined to describe Ms. Salamanca's allegedly sexual conduct in any detail in the meeting attended by Wells in February 2011 that led to Wells' alleged comment that the conduct "could not possibly be sexual harassment."[13] Whether either or both of these comments supports a finding of pretext in the context of Plaintiff's retaliation claim is an entirely separate question.

Plaintiff has not presented specific and substantial circumstantial evidence of discriminatory animus toward Plaintiff sufficient to establish pretext for purposes of the *McDonnell Douglass* burden shifting analysis. Defendant's motion for summary judgment as to Plaintiff's sex discrimination claims is GRANTED.

### 2.    <u>Section 1981.</u>

Both parties' briefs suggest Plaintiff relies upon 42 U.S.C. § 1981 as an alternative basis for his

---

[13] Plaintiff also presents some evidence that various individuals, possibly including managers, laughed at him on various occasions, but Plaintiff fails to demonstrate how any of these instances of laughter indicate intent to discriminate against him because he is a male.

1   civil rights claim. *See* Doc. 41-1 at 1; Doc. 43 at 7.[14] However, the Court has been unable to locate any

2   reference to Section 1981 in the FAC. Even if the FAC had relied upon Section 1981, it is inapplicable

3   in this case. Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every
> State and Territory to make and enforce contracts, to sue, be parties, give evidence, and
> to the full and equal benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and no other.

7   42 U.S.C. § 1981. Despite its seemingly race-neutral language, it is well-accepted that section 1981

8   "creates a cause of action only for those discriminated against on account of their race or ethnicity...."

9   *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1123 (9th Cir. 2008); *Dickerson v. Cal Waste*

10  *Solutions*, 2009 WL 2913452 (N.D. Cal. Sept. 8, 2009) ("Section 1981 does not provide a claim based

11  on sex discrimination or sexual harassment—not even when the sexual harassment or discrimination is

12  allegedly intertwined with racial discrimination."). The FAC does not allege and the record does not that

13  Plaintiff was discriminated against on account of his racial or ethnic background.

14  **C.    Retaliation Claims.**

15      Analysis of a claim for retaliatory termination under either Title VII or California law also

16  follows the *McDonnell Douglass* approach. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064

17  (9th Cir. 2002); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005)

18          **a.    Prima Facie Case.**

19      To establish a prima facie case of retaliation, Plaintiff must show: (1) he engaged in a protected

20  activity; (2) he suffered an adverse employment decision; and (3) there was a causal link between the

21  protected activity and the adverse employment decision. *Villiarimo*, 281 F.3d at 1064.

22      There is no dispute here that Plaintiff engaged in a protected activity by complaining about

23  sexual harassment. He made twelve calls to the GP employment complaint line between November 29,

24  2010 and March 14, 2011. PX 6. He also complained to Robert Einhell, one of his managers, on May

25  _____

26  [14] It is possible that these are mistaken references to 42 U.S.C. § 1981a, which is relevant in this case.

11, 2011, DX J, and to the EEOC on June 14, 2011 and November 22, 2011, PX 7.

As discussed above, Plaintiff's three-day suspension without pay constituted an adverse employment action.

To establish the final prima facie element, causation, "the plaintiff must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the adverse employment decision and that but for such activity the decision would not have been made." *Kraus v. Presidio Trust Facilities Division/Residential Mgmt. Branch*, 704 F. Supp. 2d 859, 863 (N.D. Cal .2010) (citing *Villiarimo,* 281 F.3d at 1064). "The causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision." *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) (internal citations and quotations omitted). The timing of adverse employment action can provide strong evidence of retaliation. *Stegall v. Citadel Broadcasting Co*., 350 F.3d 1061, 1069 (9th Cir. 2003); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (causation was found from proximity alone where the adverse actions occurred within three months after protected activity, two weeks after charge investigated, and less than two months after investigation ended). Here, Plaintiff's suspension occurred on August 25, 2011, less than three months after his June 14, 2011 complaint to the EEOC. Plaintiff has made out a prima facie case of retaliation.

**b.      Legitimate Non-Discriminatory Reason for Discipline/Pretext.**

Once Plaintiff makes out a prima facie case of retaliation the burden shifts back to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Stegall v. Citadel Broad. Co*., 350 F.3d 1061, 1066 (9th Cir. 2003). As was the case in the discrimination claim, Defendant satisfies this burden because Plaintiff committed a LOTO violation.

Plaintiff then has "two avenues available for showing that [Defendant's] legitimate explanation for [the adverse action] is actually a pretext for retaliation. The first is by directly persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the

17

employer's proffered explanation is unworthy of credence." *Id*. In contrast to the discrimination claim, where GP Plant Manager Troy's statements were not directly connected to Plaintiff's protected status, Troy's statements <u>are</u> directly connected to Plaintiff's protected conduct. According to Plaintiff, in reference to Plaintiff's sexual harassment complaints, Troy told Plaintiff that if Plaintiff continued to "feel[] like that," Plaintiff "would never get to where he [Troy] was at...." Ortiz Depo. 42:1-3. Troy then asked Plaintiff to "throw [his complaint] in the trash." *Id*. at 42:3-4. This is quintessential direct evidence of retaliatory animus. Plaintiff has demonstrated pretext in the context of his retaliation claims for purposes of summary judgment.

Defendant's motion for summary judgment as to Plaintiff's retaliation claims is DENIED.

**D.**   **Hostile Work Environment Claims.**

Plaintiff also advances hostile work environment claims under Title VII and FEHA. "The elements of a hostile work environment claim under the FEHA track the elements of such a claim under Title VII." *Reiter v. City of Sacramento*, 87 F. Supp. 2d 1040, 1041 n. 1 (E.D. Cal. 2000); *see also Lyle v. Warner Bros. Television Prods*., 38 Cal. 4th 264, 279 (2006) ("California courts have adopted the [Title VII] standard for hostile work environment sexual harassment claims under FEHA.").

In general, Title VII's anti-discrimination provision is violated "when sexual harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hardage v. CBS Broad., Inc*., 427 F.3d 1177, 1183 (9th Cir. 2005). To demonstrate a prima facie case of a hostile work environment under Title VII, "a person must show that: (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007). "Additionally, the working environment must both subjectively and objectively be perceived as abusive." *Id.* "Objective hostility is determined by examining the totality of the circumstances and whether a reasonable person with the same characteristics as the victim would perceive the workplace as hostile." *Id.*

18

1    Here, viewing the evidence in a light most favorable to Plaintiff, these threshold standards have

2    been satisfied for purposes of summary judgment, at least as to Plaintiff's allegations of physical

3    touching. Among other things, Plaintiff testified that Ms. Salamanca subjected him to ongoing, frequent

4    physical contact of a highly sexualized nature. He states that Ms. Salamanca rubbed her breasts against

5    him "constantly" and pressed her buttocks to his pelvic area. Ortiz Depo at 44-45, 47, 54. He also

6    presents evidence that these contacts were unwanted. He told her as much, *id*. at 53:4-7, and complained

7    (or at least attempted to complain) about Ms. Salamanca's conduct, *see Burns v. Mayer*, 175 F. Supp. 2d

8    1259, 1265 (D. Nev. 2001) (employee's complaints about coworker's conduct constituted evidence that

9    the conduct was unwanted). Finally, Plaintiff testified that he was intimidated and humiliated by the

10   conduct. Ortiz Depo. at 92:16-21. Plaintiff has raised triable issues of fact as to whether he subjectively

11   believed his work environment was intolerable. Moreover, a reasonable man faced with such a situation

12   might find his work environment to be hostile. While isolated incidents of sexual horseplay are not

13   sufficient to sustain a claim for hostile work environment sexual harassment, *Candelore v. Clark Cnty.*

14   *Sanitation Dist*., 975 F.2d 588, 590 (9th Cir. 1992), frequent touching of a sexual nature can be, *Rene v.*

15   *MGM Grand Hotel, Inc*., 305 F.3d 1061, 1067 (9th Cir. 2002) ("Title VII forbids severe or pervasive []

16   offensive sexual touching."). In an unpublished case involving remarkably similar allegations of

17   harassment, *Miscimarra v. Home Depot U.S.A., Inc*., 2004 WL 5564907 (D. Nev. Aug. 26, 2004), a

18   male plaintiff alleged his female supervisor "rub[ed] her rear end against Plaintiff's crotch while leaning

19   over to demonstrate proper procedure for stocking shelves…." The district court held this conduct

20   "pale[d] in comparison to other conduct found not to be severe enough to create a hostile work

21   environment," *id*. at *5, but the Ninth Circuit reversed, finding that the plaintiff presented sufficient

22   evidence to establish a genuine issue of material fact whether the supervisor's conduct was sufficiently

23   severe or pervasive to alter the conditions of his employment and create an abusive work environment.

24   *Miscimarra v. Home Depot U.S.A., Inc.*, 211 F. App'x 582, 583 (9th Cir. 2006). Likewise, Plaintiff has

25   presented sufficient evidence to establish that Ms. Salamanca's "rubbing" conduct was sufficiently

26   severe and/or pervasive to alter the conditions of his employment and create an abusive work

environment.

Notwithstanding this conclusion, "where harassment by a co-worker [as opposed to a supervisor or manager] is alleged, the employer can be held liable only where 'its own negligence is a cause of the harassment.'" *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)). "Title VII liability is direct, not derivative: An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct." *Swenson*, 271 F.3d at 1191-92. Where, as is the case here, an employee is allegedly harassed by co-workers, the employer may be liable if it knows or should know of the harassment but fails to take steps "reasonably calculated to end the harassment." *Dawson v. Entek Int'l*, 630 F.3d 928, 938 (9th Cir. 2011); *see also* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").[15]

The record indicates that Plaintiff's made three complaints of sexual harassment to GP: (1) his November 29, 2010 calls to the employee hotline; (2) his May 11, 2011 complaint to Robert Einhall; and (3) his June 14, 2011 EEOC complaint.

### 1. **November 29, 2010 Complaint.**

Plaintiff's initial complaint on November 29, 2010 consisted of allegations that Ms. Salamanca "brushed up" against Plaintiff when the two were working near one another. Cormier Decl. ¶ 24; PX 6 (GP 498). Later that same day, Plaintiff called the hotline again to further report that Ms. Salamanca "shows her breasts at the picnic table," "says a lot of sexually explicit things at the picnic table," and "hugs her co-workers all the time and gives them shoulder massages." *Id*. He also reported that when he

---

[15] Plaintiff suggests GP should have known of Ms. Salamanca's harassing conduct because "cameras at GP exist to confirm these incidents." Doc. 43 at 17. But, Plaintiff has presented no evidence that any such incidents were ever observed on GP cameras. Likewise, asserts that GP should have known about Ms. Salamanca's conduct because Mr. Brasher, Safety Manager, walks around the plant regularly as part of his duties. *Id*. at 2. Yet Plaintiff, who could have deposed Mr. Brasher, presents no evidence that he actually did observe such conduct. *See Burrell v. Star Nursery, Inc*., 170 F.3d 951, 954 (9th Cir. 1999) (plaintiff raised no dispute as to whether management knew or should have known of alleged sexual harassment where there was no evidence anyone witnessed the incidents and the conduct was not reported).

leaves work, Ms. Salamanca "watches by the window so she can intercept him and try to touch him." *Id.*

Viewing the evidence in a light most favorable to Plaintiff, the Court will assume that this complaint put GP on notice that Ms. Salamanca might be sexually harassing Plaintiff. "Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment." *Swenson,* 271 F.3d at 1192 (internal citation and quotation omitted). "This obligation actually has two parts. The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation." *Id.* "The reasonableness of the remedy depends on its ability to: (1) stop harassment by the person who engaged in harassment; and (2) persuade potential harassers to refrain from unlawful conduct." *Hardage,* 427 F.3d at 1186 (internal citation and quotation omitted). "Although an investigation is a key step," a court should "consider the overall picture to determine whether the employer's response was appropriate." *Id.* In the context of a claim about coworker sexual harassment, the plaintiff has the burden of proving that management knew or should have known of the harassment and failed to take reasonably prompt corrective action designed to end the harassment. *Swinton v. Potomac Corp.*, 270 F.3d 794, 803-804, 820 (9th Cir. 2001).[16]

After receipt of Plaintiff's initial complaints on November 29, 2010, the company opened an investigation into the allegations. GP's incident report indicates the investigation "began" on December 7, 2010, although it is unclear whether any work was done on the matter before February 14, 2011. DX I (GP 504). At some point (the date is illegible in the records provided to the Court), a note was entered into the investigation file indicating that Ms. Salamanca was on a leave of absence, so GP decided to "continue the investigation when [the] accused return[s] from [her leave of absence]." *Id.* (GP 505). Ms. Salamanca was apparently on disability leave from November 24, 2010 (several days before Plaintiff initially called the hotline) through February 7, 2011. Suppl. Cormier Decl., Doc. 49, ¶ 7. Ms. Cormier,

---

[16] This burden is reversed when the harassment is perpetrated by a supervisor. *Swinton*, 270 F.3d at 803-804, 820 (9th Cir. 2001).

GP's Human Resources Manager, scheduled interviews with the parties on February 14, 2011, which was the soonest they could be arranged. *Id.*; PX 6 (GP 501-506).

There is no evidence to suggest that GP took any remedial measures "to deal with the situation" prior to February 14, 2011, but, given Ms. Salamanca's absence until February 7, 2011, there was no chance that Plaintiff and Ms. Salamanca would interact, at least not until February 7. Moreover, there is no evidence that the parties interacted at all, let alone that any harassment took place, in the week between Ms. Salamanca's return on February 7 and the interviews on February 14, 2011. One week of inaction of this type, absent evidence of further harassment, does not demonstrate a failure to complete a prompt and effective investigation. *See Tatum v. Arkansas Dep't of Health*, 411 F.3d 955, 959-60 (8th Cir. 2005) (where investigation not begun until two weeks after complaint and took eight weeks to complete, but no harassment took place in the interim, no failure to complete a prompt and effective investigation).

The employer also has an obligation to take permanent remedial steps once it has completed its investigation, but only if the claims of harassment are substantiated. "When an employee accuses a fellow employee of sexual harassment, the employer must reconcile competing rights: the accuser's right to a harassment-free workplace and the accused's right not to be disciplined without fair procedures and sufficient proof of wrongdoing." *Swenson*, 271 F.3d at 1188-89. "As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment." *Id.* at 1196. An "employer can act reasonably, yet reach a mistaken conclusion as to whether the accused employee actually committed harassment." *Id.*

In his initial interview with Ms. Cormier, Plaintiff declined to depict any sexual touching; denied that Ms. Salamanca actually "showed her breasts;" and, at the very most, asserted Ms. Salamanca used the "F word" in the workplace. Regarding Plaintiff's related complaint that Ms. Salamanca tried to intercept him to touch him, Plaintiff explained that on a few occasions, Ms. Salamanca would come to the door where the time clock was located and stand close to him while he was trying to punch out for

1   the day. Cormier Decl. ¶ 26. According to GP's records, Plaintiff denied any physical contact. *Id*. at ¶

2   27. At his deposition, Plaintiff did not contradict Ms. Cormier's description of this interview, except to

3   indicate that he did recall telling managers that Ms. Salamanca "physically touched" him; however,

4   Plaintiff admits that he refused to describe or show anyone how the touching occurred, apparently

5   because Mr. Ortiz did not want to touch Ms. Cormier in demonstration. Ortiz Depo. 116-117. GP

6   concluded that Plaintiff's sexual harassment allegations were unsubstantiated, and the matter was closed.

7   *Id*. ¶ 28 & DX I. Plaintiff's refusal to describe the alleged harassment in any detail is relevant to the

8   reasonableness analysis. *See Hardage*, 427 F.3d at 1186 (employee's refusal to tell the "gory details" of

9   the alleged harassment or apprise the employer of the "specifics about sexual contact" weighed in favor

10  of finding of reasonableness). Plaintiff has submitted no evidence that even arguably suggests that GP

11  was at the time of its decision in possession of information that would render unreasonable its

12  conclusion that his allegations[17] were unsubstantiated.

13          **2.     May 11, 2011 Complaint.**

14          Plaintiff's May 11, 2011 complaint to Robert Einhell was no more explicit. Plaintiff reported that

15  while he was trying to enter the facility to punch in, Ms. Salamanca was inside the facility looking out

16  the door window at him. Ms. Salamanca allegedly opened the door and looked at him while he entered

17  the facility, and then proceeded to laugh at him. *Id*. According to GP's records, Plaintiff denied that any

18  physical contact was made. *Id*. Plaintiff's deposition testimony does not contradict GP's records.

19  Although he testified that Ms. Salamanca did touch him, he could not recall whether he told Mr. Einhell

20  as much. Ortiz Depo. at 163-64. Nevertheless, GP investigated the complaint, interviewed the parties,

21  and counseled both to respect one another. Cormier Decl. at ¶¶ 31-34.

22          The conduct <u>as described by Plaintiff to GP at the time</u> in this second complaint does not amount

23  ─────────────────────

24  [17] Plaintiff correctly points out that Patrick Macias, Plaintiff's son-in-law and a former GP employee, called the GP employee hotline to report inappropriate behavior of a sexual nature, including some inappropriate sexual behavior by Ms. Salamanca.

25  Cormier Decl. ¶ 25; PX 3. As described above, Mr. Macias states: he "heard [his] co-workers speak about Maria Salamanca in an explicit, sexual manner;" he "observed Tim Juarez and Maria Salamanca touch each other in a sexual manner;" and he "observed that Maria Salamanca and other co-workers [] would engage in highly sexualized conversations during business

26  hours." PX 3. These statements did not put GP on notice that Ms. Salamanca might be engaging in inappropriate conduct directed at Plaintiff, nor that she might be sexually harassing any other employee.

to sexual harassment because it is not extreme or severe. *See Walpole v. City of Mesa*, 162 F. App'x 715, 716-17 (9th Cir. 2006) (co-worker occasionally staring at plaintiff was not pervasive enough to constitute sexual harassment for purposes of Title VII); *Lappin v. Laidlaw Transit Inc*., 179 F. Supp. 2d 1111, 1120-21 (N.D. Cal. 2001) (co-worker sticking out his tongue and wiggling it at plaintiff, even when combined with derogatory name-calling, cannot sustain a hostile work environment claim); *Marceu v. Idaho*, 2011 WL 3439178, *18 (D. Idaho, Aug 5, 2011) (co-worker staring at plaintiff after making romantic advances toward her by leaving chocolates in her office does not support existence of hostile work environment claim). Nor did Plaintiff describe to GP any conduct that was sexual in nature.

Even if, *arguendo*, one could conclude that the conduct reported to Mr. Einhell in May 2011 constituted sexual harassment, Plaintiff has presented no evidence to support a finding that based upon GP's knowledge at the time, GP failed to take reasonable steps to end any harassment of which it had knowledge. "Counseling or admonishing the offender can constitute an adequate disciplinary response." *Star v. West*, 237 F.3d 1036, 1039 (9th Cir. 2001) (internal citation and quotation omitted); *Swenson*, 271 F.3d at 1197 & n. 16. ("[W]here the proof of harassment is weak and disputed … the employer need not take formal disciplinary action simply to prove that it is serious about stopping sexual harassment in the workplace.").

### 3.   June 14, 2011 EEOC Complaint.

On June 14, 2011, Plaintiff filed a complaint with the EEOC, alleging, in pertinent part:

> In June 2010, Maria Salamanca, coworker, began sexually harassing me. For example, she would purposefully rub her body against mine and would engage in inappropriate conduct with other coworkers. I reported the harassment to Tess Cormier, HR assistant, in November 2010, after which an investigation was launched. In February 2011, I was informed by Bill Yeager, HR Director, that the investigation failed to disclose any evidence of harassment and merely gave Ms. Salamanca a verbal warning; however, despite a second complaint, Ms. Salamanca continues to engage in harassing behavior such as obstructing my way. Moreover, after reporting the harassment, I was subjected to discipline by receiving negative points for failing to work overtime while others, with less seniority, refuse overtime and do not receive points against them.

PX 7, at p. 97 of 150.

Plaintiff maintains that this complaint triggered a renewed duty to investigate his complaints and

points out that no such investigation took place. Doc. 43 at 20. The only investigation that followed this EEOC complaint focused on the retaliation aspects of the complaint. Cormier Decl. at ¶¶ 43-56. However, the plain language of his EEOC complaint indicates that any rubbing or touching occurred in the past. GP previously conducted its own investigation into Plaintiff's "rubbing" allegations and concluded that no sexual harassment took place. Plaintiff has not presented nor can the Court identify any authority supporting the assertion that the repetition of an allegation in a subsequent complaint to an external agency imposes upon an employer a renewed duty to investigate conduct that an employer has already investigated.

The only allegation of ongoing conduct in his EEOC complaint was the assertion that Ms. Salamanca continues to "obstruct [Plaintiff's] way." GP had previously investigated a similarly complaint, namely, Plaintiff's May 11, 2011 complaint to Robert Einhall. During that investigation, Plaintiff denied any physical contact was made. Even if this allegation represented a complaint about entirely new conduct, Plaintiff has not presented evidence establishing that any such obstruction was sexual in nature, let alone that it was severe or pervasive. There is some authority suggesting that impeding or blocking movement may constitute physical harassment, but only when "directed on the basis of sex." 2 Cal. Code. Regs. § 7287.6(b)(1)(B) (defining physical harassment to include "impeding or blocking movement, or any physical interference with normal work or movement, when directed at an individual on a basis enumerated in FEHA"); *Lyle v. Warner Bros. Television Prods*., 38 Cal. 4th 264, 280 (2006) (citing § 7282.6); *Lytel v. Simpson*, 2006 WL 1233094, *3 (N.D. Cal. May 8, 2006) (same, specifically discussing whether various acts were directed at the plaintiff because of her sex or whether the acts were severe or pervasive). Here, even assuming Ms. Salamanca was obstructing Plaintiff's movement in the workplace, there is absolutely no evidence that Plaintiff told his employer she was doing so because of Plaintiff's sex or in a sexualized manner. Moreover, unlike Plaintiff's testimony regarding Ms. Salamanca's alleged rubbing behavior, there is no evidence that Ms. Salamanca obstructed his movement in a severe or pervasive manner.

In summary, GP did not have a duty to re-investigate past conduct it had already investigated. To

25

the extent that Plaintiff's June 2011 EEOC complaint alleged any continuing conduct, that allegation was limited to Ms. Salamanca allegedly obstructing his movement in the workplace. Plaintiff has failed to present evidence that this conduct rose to a level of severity/pervasiveness that could support a sexual harassment claim. Therefore, GP's failure to separately investigate it (keeping in mind that GP investigated a similar allegation one month earlier) cannot give rise to liability under Title VII.

Defendant's motion for summary judgment as to Plaintiff's hostile work environment claim is GRANTED.

**E.    FEHA Aiding and Abetting.**

Under FEHA, it is an unlawful employment practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of any acts forbidden [under the Code section], or to attempt to do so." Cal. Gov. Code § 12940(i). FEHA itself does not define "aiding and abetting," but California courts have adopted the common law definition whereby a person "aids and abets the commission of an intentional tort if the person [ ] knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act." *Fiol v. Doellstedt,* 50 Cal. App. 4th 1318, 1325 (1996) (applying this definition to FEHA aiding and abetting claim).

In *Alch v. Superior Court*, 122 Cal. App. 4th 339, 389-90 (2004), for example, a talent agency was found to have given substantial assistance or encouragement to defendant employers in an age discrimination case where the talent agency, among other things, provided a financial incentive to discriminate, itself discriminated against older writers with respect to referral and representation, and refused to submit older writers for television writing opportunities with networks and studios. Here, in support of a finding that GP aided and abetted Ms. Salamanca, Plaintiff argues that GP failed to discipline Ms. Salamanca and/or failed to ensure that both parties were not working on the same shift or overlapping shifts on the same or different machines. A failure to act is a far cry from providing substantial assistance and conflates an "aiding and abetting" claim with a claim brought under Cal. Gov. Code § 12940(k), which makes it unlawful for an employer to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

Defendant's motion for summary judgment on Plaintiff's adding and abetting claim is GRANTED.

**F.    FEHA Failure to Prevent Unlawful Discrimination and Harassment.**

Plaintiff also alleges a claim under Cal. Gov. Code § 12940(k), which makes it unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." This provision also makes it unlawful for an employer to fail to prevent retaliation. *Taylor v. City of Los Angeles Dep't of Water & Power*, 144 Cal. App. 4th 1216, 1240 (2006) disapproved of on other grounds by *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158 (2008).

To maintain a cause of action under this provision, Plaintiff must establish "(1) [he] was subjected to discrimination, harassment or retaliation; (2) defendant failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and (3) this failure caused plaintiff to suffer injury, damage, loss or harm." *Leland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008).

Because Defendant is entitled to summary judgment on Plaintiff's sex discrimination claim, he cannot maintain FEHA failure to prevent claim based upon that allegation. *See Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 285-89 (1989) (no failure to prevent claim in the absence of underlying discrimination).

Likewise, even though Plaintiff presented evidence that could permit a finder of fact to conclude that Ms. Salamanca sexually harassed him for purposes of Title VII and FEHA, the Court has already concluded that GP took all reasonable steps to prevent that harassment given what it knew at the time of Plaintiff's complaints. Therefore, Plaintiff cannot maintain a failure to prevent claim based upon his hostile work environment allegations.

Plaintiff's retaliation claim has survived summary judgment, thereby satisfying the first element of a failure to prevent claim as to that allegation. The difficulty is that Plaintiff has failed entirely to present evidence (or even argue) that GP failed to take reasonable steps to prevent retaliation. *See* Doc. 43 at 17-20. "Prompt investigation of a discrimination claim is a necessary step by which an employer

27

meets its obligation to ensure a discrimination-free work environment." *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002). Plaintiff in fact admits that GP investigated the retaliation allegation in his June 2011 EEOC complaint and takes no issue with the reasonableness of that investigation. *Id.* at 20. It is not the Court's role to make arguments for any party. Plaintiff's failure to prevent retaliation claim therefore fails.

Defendant's motion for summary judgment as to Plaintiff's FEHA failure to prevent claim is GRANTED.

**G.      Intentional and Negligent Infliction of Emotional Distress.**

Finally, Defendant moves for summary judgment on Plaintiff's claims for intentional and negligent infliction of emotional distress ("IIED" and "NIED"). It is plain from the FAC and Plaintiff's opposition that Plaintiff bases his IIED and NEID claims on Ms. Salamanca's alleged harassing behavior, not on his allegations of sex discrimination or retaliation by GP. FAC ¶¶ 99- 111; Doc. 43 at 20-23.

Under California law, "[a] cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (internal citation and quotation omitted).

Defendant's motion focuses on the factual record and argues that Plaintiff cannot establish any of these elements, totally ignoring several important issues. As a general rule, California's Worker's Compensation Act bars civil actions against an employer for the intentional torts of a co-worker. *Fretland v. County of Humboldt,* 69 Cal. App. 4th 1478, 1484-85 (1999). However, when an IIED claim is based upon sexual harassment, this exclusivity rule does not apply, because such conduct is outside the scope of the employment relationship. *See Murray v. Oceanside Unified School Dist.*, 79 Cal. App. 4th 1338, 1362-63 (2000). For the same reason, an employer may not be held liable for discrimination or

1  sexual harassment under the doctrine of *respondeat superior*. *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal.

2  App. 4th 833, 852 (1998).

3    Despite this, an employer may be liable in tort based on a theory of ratification. *Id.* ("A principal

4  is liable when it ratifies an originally unauthorized tort."). "[R]atification generally occurs where, under

5  the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive,

6  fraudulent, or malicious behavior by an employee in the performance of his job duties." *Coll. Hosp. Inc.*

7  *v. Superior Court*, 8 Cal. 4th 704, 726 (1994). "Corporate ratification … requires actual knowledge of

8  the conduct and its outrageous nature." *Id.* "The failure to discharge an employee after knowledge of his

9  or her wrongful acts may be evidence supporting ratification." *Delfino v. Agilent Technologies, Inc.*, 145

10  Cal. App. 4th 790, 810 (2006) (internal citation and quotation omitted).

11    Here, as discussed in detail in the analysis of Plaintiff's hostile work environment claim,

12  although Plaintiff's later deposition testimony could support a finding that Ms. Salamanca engaged in

13  outrageous conduct, GP did not have knowledge of the details of Ms. Salamanca's conduct and therefore

14  could not possibly ratify any outrageous conduct in which she may have engaged. To the extent the

15  doctrine of ratification requires reasonable investigation into an allegation of wrongdoing, *see Reusche*

16  *v. California Pac. Title Ins. Co.,* 231 Cal. App. 2d 731, 737 (1965), GP satisfied that requirement as

17  well, as discussed previously. There is therefore no possible basis upon which GP could be held liable

18  for the intentional tort of IIED. The same logic applies to NIED, which is a form of the tort of

19  negligence. *See Huggins v. Longs Drug Stores California, Inc.,* 6 Cal. 4th 124, 129 (1993).

20    Defendant's motion for summary judgment as to the IIED and NIED claims is GRANTED.

21  **H.**   **Punitive Damages.**

22    Defendant moves for summary judgment that Plaintiff cannot sustain his prayer for punitive

23  damages as to any remaining claims. The availability of punitive damages in a Title VII case is governed

24  by statute. 42 U.S.C. § 1981a(b)(1) provides:

25     A complaining party may recover punitive damages under [Title VII] against a
    respondent (other than a government, government agency or political subdivision) if the
26     complaining party demonstrates that the respondent engaged in a discriminatory practice

or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

In *Kolstad v. American Dental Association*, 527 U.S. 526, 536 (1999), the Supreme Court concluded a defendant is appropriately subject to punitive damages if it acts "in the face of a perceived risk that its actions will violate federal law." Punitive damages "apply in intentional discrimination cases where the plaintiff can show that the employer knowingly or recklessly acted in violation of federal law." *Hemmings v. Tidyman's Inc*., 285 F.3d 1174, 1197 (9th Cir. 2002) (citing *Kolstad*, 527 U.S. at 535).

The standard for awarding punitive damages under California law is similar, where punitive damages may be appropriate if "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. Malice may be shown where the defendant exhibits "the motive and willingness to vex, harass, annoy, or injure," *Nolin v. Nat'l Convenience Stores, Inc.,* 95 Cal. App. 3d 279, 285 (1979) (internal citation and quotation omitted), or a "conscious disregard of the rights and safety of others," *Potter v. Firestone Tire & Rubber Co.,* 6 Cal. 4th 965, 1000 (1993). A plaintiff may establish malice "by indirect evidence from which the jury may draw inferences." *Taylor v. Superior Court,* 24 Cal. 3d 890, 894 (1979).

If a plaintiff is able to establish intentional discriminatory conduct, that plaintiff "would by definition have satisfied the requirement for showing the 'reckless indifference' required for an award of punitive damages." *Stender v. Lucky Stores, Inc*., 803 F. Supp. 259, 324 (N.D. Cal. 1992); *see also Lucid v. City & Cnty. of San Francisco*, 774 F. Supp. 1234, 1240 (N.D. Cal. 1991) (refusing to grant defense motion regarding punitive damages in First Amendment case where plaintiffs contended defendants harassed plaintiffs and threatened plaintiffs with termination). Evidence of retaliation can satisfy the standard. *Hemmings*, 285 F.3d at 1199 (punitive damages award withstood challenge where defendants excluded plaintiffs from decision making process and harassed plaintiffs after they filed a discrimination complaint); *Johnson Consumer Prods., Inc.,* 212 F.3d 493, 514-16 (9th Cir. 2000) (evidence of retaliation was "unquestionably sufficient" to satisfy the "malice or reckless indifference" standard for punitive damages under Title VII).

Because Plaintiff's retaliation claim survives and evidence of retaliation is sufficient to satisfy the malice or reckless indifference standard for punitive damages, Plaintiff's prayer for punitive damages presents a question of fact for the jury.

Defendant's request for judgment as to Plaintiff's prayer for punitive damages is DENIED as to the retaliation claim. Given that Defendant is entitled to judgment as to all other claims in the case, its motion with respect to punitive damages as to these claims is DENIED as moot.

## V. CONCLUSION AND ORDER.

Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Defendant's motion is DENIED as to Plaintiff's retaliation claims under Title VII and FEHA and as to Plaintiff's prayer for punitive damages as to that claim only. Defendant's motion is GRANTED in all other respects.

**SO ORDERED**
**Dated: September 23, 2013**

**/s/ Lawrence J. O'Neill**
**United States District Judge**

31